******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SNM II CORP. *v.* TANGO YANKEE, LLC, ET AL.
## (AC 48214)

Cradle, C. J., and Elgo and Moll, Js.

*Syllabus*

The defendant appealed from the trial court's judgment finding that the defendant had violated the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.) by charging the plaintiff unauthorized storage fees for its airplane. The plaintiff had delivered the plane to M Co. for certain service and repair work. The plaintiff and M Co. became involved in a dispute regarding payment for that work, and M Co. moved the plane to the defendant's property for storage. On appeal, the defendant claimed that the court erroneously concluded that it violated CUTPA by charging the plaintiff storage fees because those fees were authorized pursuant to statute (§ 49-92g), in that it stored the plane at the request of M Co., which was the legal possessor of the plane at that time. *Held*:

The trial court erroneously concluded that the defendant violated CUTPA by charging the plaintiff storage fees for the plane without the request or consent of the plaintiff, as M Co. was in control of the plane after the plaintiff placed the aircraft in its possession, when M Co. performed the repairs requested by the plaintiff and when M Co. moved the plane to the defendant's property for storage, and, accordingly, because M Co. was the legal possessor of the plane when it requested that the defendant store the plane, the plain language of § 49-92g authorized the defendant to charge the plaintiff for storing the plane and to file a lien on the plane when the storage charges were not paid.

Argued November 17, 2025—officially released March 17, 2026

*Procedural History*

Action to recover damages for, inter alia, alleged violations of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Danbury, where Master Aviation, Inc., was cited in as an additional defendant; thereafter, the case was tried to the court, *Shaban, J.*; judgment in part for the plaintiff, from which the named defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Christopher G. Brown*, for the appellant (named defendant).

*Opinion*

CRADLE, C. J. The defendant Tango Yankee, LLC, doing business as Business Aircraft Center,[1] appeals from the judgment of the trial court, following a court trial, rendered in favor of the plaintiff, SNM II Corp., on the ground that the defendant violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by charging the plaintiff unauthorized storage fees for its airplane. Because we conclude that the storage fees charged by the defendant were authorized under General Statutes § 49-92g,[2] we reverse the judgment of the trial court.[3]

The following facts, as set forth by the trial court, and procedural history are relevant to our resolution of this appeal. "In 2016, [the plaintiff] was the registered owner of a Piper Aerostar 601P/700P airplane Identity Number N800FY. The principal of the [plaintiff]

---

[1] Although Master Aviation, Inc., and SSSuperstar, LLC, also are defendants in this action, they have not participated in this appeal. We therefore refer to Tango Yankee, LLC, doing business as Business Aircraft Center, as the defendant in this opinion.

[2] General Statutes § 49-92g provides: "Any person who stores, cares for, maintains, repairs, or furnishes any services, gasoline, accessories, materials or other supplies at the request of or with the consent of the owner, his agent or legal possessor of an aircraft, as defined in section 15-34, has a lien upon the aircraft until the sum due for any fees, expenses or charges for such storage, care, maintenance or repair or the furnishing of such services, gasoline, accessories, materials or other supplies has been paid. The lienor shall be entitled to retain possession of the aircraft until the amount of fees, expenses or charges for such storage, care, maintenance or repair or the furnishing of such services, gasoline, accessories, materials or other supplies has been paid or the lien has been dissolved. The lien shall be superior to all other liens, except liens for taxes. Any person entitled to a lien pursuant to this section shall, within ninety days after the date upon which work or services were performed or when such fees, expenses or charges were incurred, file a verified statement in the office of the Secretary of the State, pursuant to the provisions of sections 49-92h and 49-92i."

[3] The plaintiff did not file a brief in this appeal and did not attend oral argument before this court. We, therefore, have considered this appeal on the basis of the defendant's brief and oral argument, the clerk appendix, and the record. See, e.g., *Marino* v. *Marino,* 222 Conn. App. 902, 903 n.1, 302 A.3d 953 (2023).

corporation, Sergio Morgandinho, [was] a pilot for thirty years, [and] . . . [the plaintiff] had been the owner . . . of the six seater twin engine plane since 2005. In the fall of 2016, Morgandinho flew the plane from Maryland [where he resided] to the airport in Danbury . . . to be inspected by Master Aviation [Inc. (Master Aviation)] [because] he had an individual who was interested in purchasing the plane. The plane was brought there because Master Aviation was one of the few companies nationally [that was] experienced enough to work on such planes given both its age and that they were no longer in production. The plane needed to be worked on [because] it had sat idle for nearly five years while being held as evidence due to a federal investigation of the plane's prior servicer. Once it was in Danbury, Morgandinho left the plane's logbooks with the president of [Master Aviation], [Alan Speakmaster], so that he could enter Federal Aviation Administration **(FAA)** mandated annual certifications into them following any necessary service or repair work. . . . Following his initial inspection of the plane, Speakmaster determined that it was in such poor condition that it should not be flown any further and made clear to the potential buyer [that] he should not purchase it. . . .

"[A]lthough an annual certification of the plane's airworthiness would typically take between thirty [and] sixty days, Morgandinho expected the work to take approximately three to six months given the plane's condition. The plaintiff then agreed to hire Master Aviation to perform the services necessary to place the plane into a safe operating condition and have its annual certification performed for 2017. Based on his initial review, Speakmaster estimated the repair costs to be approximately $25,000. After a more detailed inspection, Speakmaster informed the plaintiff that the [plane] was unsafe to fly and that the cost to make all [of] the necessary repairs to obtain a certification would be approximately $50,000. [Morgandinho] agreed and made the payment of $50,000 on February 7, 2017, and the work on the plane commenced. On July 11, 2017, Master Aviation billed the plaintiff for work done to that date, which totaled

$73,017.93, leaving a balance due of $23,017.93. All bills were sent to Morgandinho by email. The plaintiff made three separate payments on July 11, September 8 and October 25, 2017, which completely paid off the bill. . . . The work was completed sometime around September, 2017. At that time, Speakmaster entered a 'return to service' notation into the logbook (i.e., the certification that the plane was airworthy), contacted [Morgandinho] and informed him the plane was ready and asked him to come up to fly the plane. Although Morgandinho twice told Speakmaster he would do so, he did not come. Morgandinho claimed he did not pick up the plane in 2017 because he had not received the certification from Master Aviation that he had specifically asked be sent to him. Once Speakmaster had finished working on the plane, he had it removed from the hangar where the work had been done and moved to a 'tie-down' space on the tarmac at the airport.

"In the late fall of 2017, Morgandinho's mother became ill, which caused him to leave the country and attend to her in Portugal for several months. He returned to the United States in late April, 2018. At that time, he spoke to Speakmaster and asked that a new certification for 2018 be done because the existing certification would expire in June, 2018. Speakmaster agreed to do so but Morgandinho did not hear from him until December, 2018, when Speakmaster sent a text [message] saying [that] the annual certification had been done. When Morgandinho inquired about the bill for the certifications for 2017 and 2018, Speakmaster notified him that there was an additional bill for $12,311.81, which was invoiced on December 3, 2018. . . . In a contentious and heated phone conversation, Morgandinho repeatedly asked for proof of the certifications for 2017 and 2018 but was not given any response. He then indicated to Speakmaster that he did not have the funds to immediately pay the additional bill but said [that] if he could pick up the plane and complete the sale to an interested buyer, he could then do so. A series of [text messages] between the parties ensued between January 7 and October 25,

2019, in which Morgandinho repeatedly asked for proof of the certifications and/or the logbooks [because] he had potential buyers for the plane and wanted to come pick it up. Morgandinho specifically asked for the certifications on January 22 and 25, twice on January 30, May 1, [in] June, June 12 and October 25, 2019. . . .

"Because of the statutory ninety day limit for the filing of a statutory lien for work done on the plane, Master Aviation filed its lien against the plane on February 4, 2019, for the balance due. . . . By May, 2019, Morgandinho had learned that Master Aviation had put the lien on the plane [because] Speakmaster sent him a copy. . . . Speakmaster also indicated in an October 25, 2019 text [message] that, because the bill had not been paid, he had removed seats and navigational equipment from the plane so that it could not be taken by Morgandinho before he had made payment. . . . Eventually, Morgandinho offered to pay the bill provided that Speakmaster [produce] the certifications. Speakmaster offered to accept $50 per month toward the bill and that Morgandinho could then come get the certifications. [Although] Speakmaster . . . could have easily sent a copy of the certifications by text [message] . . . by that point, no matter what Morgandinho proposed, he was uncomfortable with him and did not trust him. For example, in the October 25, 2019 text [message], Morgandinho asked that an updated certification be done for 2019. Speakmaster conceded that he ignored this request because he found it 'disgusting' given that he had not been paid for the 2017 and 2018 certifications. A review of the text exchanges makes it abundantly clear that both parties were so greatly frustrated with the other that neither party was willing to accept the other's offers, thereby resulting in an absolute stalemate.

"By October 9, 2019, Master Aviation had its counsel issue a letter to [the plaintiff], to Morgandinho's attention, stating [that] it had liened the plane for the amount due, that there had been no action brought to dissolve the lien or substitute a bond, and that, if the debt remained

unpaid, Master Aviation would commence the process of auctioning the plane to satisfy the lien pursuant to . . . § 49-92g et seq. . . .

"The work performed by Master Aviation was done at a hangar located at [the] Danbury airport. At that time, approximately one third of the space in the hangar . . . was leased from [the defendant] doing business as Business Aircraft Center. Because of the length of time that the dispute lasted, Speakmaster had moved the plane to one of the sixty spots available on the tarmac and had it tied down at that spot.[4] That space was owned by [the defendant], which charged storage fees for the use of its space. Speakmaster never discussed storage fees with Morgandinho because he never envisioned that the plane would be left at the airport for a long period of time. In the October 25, 2019 text [message], given the length of time the dispute had carried on, Morgandinho told Speakmaster that he should take care of any parking fees (i.e., storage costs) [because] it was 'not my fault you prevented me from picking up the aircraft.' . . . He offered to come pick up the plane to remove it from the airport if it was a problem. Speakmaster repeatedly responded by demanding payment of the bill first before he would release the plane.

"Some four months later, on February 27, 2020, the plaintiff was contacted through email by Lynda and Santo Silvestro, the owners of [the defendant], who inquired as to why the [storage] bill had not been paid. The email noted that '[the] aircraft has been sitting in a tie-down spot at my business for over [eighteen] months and we need to get payment. This aircraft will not leave our premises until we . . . are made whole.' Responding the same day, Morgandinho asked, 'Who are you?' Lynda Silvestro . . . responded by stating she was the owner of [the defendant]. . . . Morgandinho then called Lynda Silvestro, who demanded payment.

[4] Speakmaster testified that he only leased three spaces in the hangar and that it was customary for him to ask the defendant to move planes from the hangar to a tie-down spot after he serviced them.

In turn, Morgandinho stated [that] he had never heard of them before and had never authorized the plane to be placed onto their property. There was no evidence that, as [the plaintiff's] agent, Morgandinho ever asked or consented, either directly or indirectly, to Master Aviation moving the plane to be tied down on the area of the tarmac controlled by [the defendant]. Nor was there any evidence produced of any contact or an oral or written agreement between [the defendant] and [the plaintiff] for the charging of storage fees.

"The email sent by the Silvestros referenced certified letters that had been sent to Morgandinho that were returned and noted by the post office as unable to be forwarded. Morgandinho claimed that he had never received any such letters in any form. He also noted that he had never heard of [the defendant] and had not given either [the defendant], or the Silvestros individually, his email address. In speaking to Lynda Silvestro, Morgandinho told her that Master Aviation, through Speakmaster, had never told him that he would be charged for storage by anyone. During that conversation, Morgandinho first learned of [the defendant] having placed a lien on the plane for the storage fees and indicated that he had not been served by a marshal, certified mail, or otherwise. He spoke to Santo Silvestro the next day and told him the same thing.[5] He made clear that he considered Master Aviation to be responsible for any such fees as he had not authorized it to place the plane on [the defendant's] property. . . .

"As a result of the plaintiff having failed to pay Master Aviation for the 2018 invoice of $12,311.81 and [the defendant's] claimed [storage] fee of $5970, both parties placed a lien on the plane pursuant to [§ 49-92g]. Master Aviation's lien for the invoiced amount was filed with the Secretary of the State's office on February 4, 2019. . . . [The defendant's] lien was filed with the Secretary of

---

[5] It was disputed at trial whether or when the plaintiff learned of the liens placed on his plane. The court's determinations as to when and how the plaintiff was notified of the liens are not at issue in this appeal.

the State's office on November 15, 2021. . . . That lien claimed storage fees for the period May 12, 2017, until the date of filing . . . . The November 15, 2021 date was the end date of the lien [because] Santo Silvestro, without any input from the plaintiff, directed [that] the plane be put in the hangar since he intended to have the plane auctioned off to pay the lien.

"In late 2021, [the defendant] retained counsel experienced in aviation law, James McLaughlin, to initiate the procedures provided by [§ 49-92g et seq.] for the collection of its invoice. McLaughlin obtained the mailing address of [the plaintiff] from the registration form on file with the FAA. . . . The registration form was issued on October 16, 2018, was valid through October 31, 2021, and referenced an address of 9058 Major Smith Lane, Frederick, Maryland. . . .

"Consistent with the information on the FAA form and General Statutes § 49-92h (a), McLaughlin sent notice of the lien and auction procedure to [the plaintiff] at the 9058 Major Smith Lane, Frederick, Maryland address by certified mail on November 16, 2021. Receipt of the notice was acknowledged and verified by the United States Postal Service by document dated November 18, 2021. . . . [T]he letter was issued for the purpose of advising [the plaintiff] and Morgandinho of [the defendant's] lien having been placed on the plane and of the auction procedure pursuant to the General Statutes. . . . [T]he notice called for the auction to be held on January 19, 2022, and . . . the notice was published in the Danbury News-Times newspaper on December 13, 20 and 27, 2021, in accordance with the statute. . . .

"[The plaintiff] received the letter and had notice of the lien and auction procedure. No court action was taken by [the plaintiff] to contest the lien. An auction was held on January 19, 2022, as scheduled. At the time of the auction, the plane had been at the [Danbury] airport for approximately five years. The paint on the plane had begun to peel and rust was showing. Shortly before the auction, Santo Silvestro created a new company,

SSSuperstar, LLC [(SSSuperstar)], for the purpose of bidding on the plane. That company was the only bidder at the time of the auction. From the proceeds of the sale, the full amount of the liens of both Master Aviation ($12,311.81) and [the defendant] ($5970) were paid.[6] SSSuperstar claimed that, after acquiring the plane, it spent over $100,000 in repairs to make the plane capable of flying and to be certified for the current year. It is clear that some repairs had become necessary due to the plane's condition having deteriorated over such a lengthy time sitting idle on the tarmac at the airport. Speakmaster confirmed that, as of the time of the auction, the plane's condition had deteriorated [because it had not] been maintained and that SSSuperstar 'had to spend a fortune' to bring the plane back to a flyable condition. However, no documentation was produced by either Speakmaster or SSSuperstar to evidence the claimed expenditures. Following whatever repairs to the plane had been made, SSSuperstar engaged a broker to sell it and it was eventually sold to a third party . . . for approximately $142,500.

"Subsequent to the auction, Morgandinho found out about the sale of the plane through information discovered on the Internet. He never received any paperwork regarding the plane's sale following the auction." (Citations omitted; footnotes added; footnote in original.)

The plaintiff commenced this action seeking damages for the alleged unauthorized sale of its plane. In the operative five count complaint, filed on November 27, 2023, the plaintiff alleged, inter alia, that the defendant violated CUTPA because the storage fees charged by the

---

[6]"Lynda Sylvestro testified that the May 12, 2017 date for commencement of services on the lien was incorrect as amounts due for 2018 and prior years had been written off. She stated the start date for any amounts due should have been from January 1, 2019, forward. Also, defendants' exhibit A is a Tango Yankee, LLC, invoice showing a balance due of $7405 for the period July 1, 2019, to January 1, 2022, and marked as having been paid in full. The payment was made out of the proceeds of the auction of the plane even though the lien filed was for a different period of time and for a different amount."

defendant were unauthorized in that the plaintiff had never requested or consented to the storage of its plane by the defendant.[7] The defendant denied the allegations of the plaintiff's complaint.

On November 6, 2024, following a trial to the court and the filing of posttrial briefs by the parties, the court filed a memorandum of decision finding, inter alia, in favor of the plaintiff on its CUTPA claim against the defendant.[8] In so doing, the court reasoned: "[Although] there is sufficient circumstantial evidence to lead the court to conclude that, while the [defendant's] lien was properly noticed pursuant to statute, the amount claimed for storage charges was not supported by any agreement with [the plaintiff]. In fact, the plane was placed on the [defendant's] property at the direction of Master Aviation without the consent or knowledge of [the plaintiff]. [The defendant] charged fees to [the plaintiff] without having had any contact with [the plaintiff], its principal or agent, and without having entered into any oral or written agreement to do so. It did not even know of any contact information for [the plaintiff] until it later obtained the information from Master Aviation. . . . The court also notes its collection of $7405 from the sale of the plane was substantially more than the $5970 set forth in its lien. See footnote [6 of this opinion].

"The court finds that [the defendant] was involved in the trade or commerce of running an airport and that its unauthorized actions with respect to the storage of the plane at the airport and the collection of $1435 in excess of its lien constitute an unfair trade practice [that] caused substantial injury to [the plaintiff].[9] Collectively, these

---

[7] The plaintiff also alleged conversion as to the defendant and SSSuperstar and CUTPA violations by Master Aviation and SSSuperstar.

[8] The court found in favor of the defendant and SSSuperstar on the plaintiff's conversion claims. The court found in favor of SSSuperstar on the plaintiff's CUTPA claim, but in favor of the plaintiff on its CUTPA claim against Master Aviation. Those rulings have not been challenged on appeal.

[9] The court also concluded: "There was also a lack of any evidence whatsoever that [the defendant] had complied with §49-92h (c) relative to payment to the owner of record the balance of any sale proceeds

actions and inaction constitute a basis for the finding of a CUTPA violation by [the defendant]." **(Footnote added.)** The court also found that "several of the actions of Master Aviation in its effort to be paid leading to the auction constituted an unfair trade practice that would be considered unfair or unscrupulous conduct [that] caused substantial injury to [the plaintiff]."

As to damages, the court explained: "There was sufficient evidence to establish that the liens totaling $18,281.81 were paid off by virtue of the sale of the plane, plus an additional $1435 to [the defendant]. However, there was no evidence of what the actual amount of the successful bid was. The most competent evidence of the value of the plane at the time of the auction was the evidence that it was sold shortly thereafter by SSSuperstar for $142,500. Because the actions of Master Aviation and [the defendant] [that] led up to the auction have been found to constitute CUTPA violations, the court finds . . . the value of the plane as of the time of the auction less the payment of the liens to be the measure of damages. Accordingly, the court awards the plaintiff $124,218.19." The court further awarded the plaintiff "a de minimis amount of $500 in attorney's fees and $500 in punitive damages."[10] On the basis of the foregoing,

after the satisfaction of any security interests. Even if there were no proceeds left following payment of the security interests, it does not excuse the failure of the [defendant] to notify [the plaintiff] as to what the balance of the proceeds [was] following the sale. At the very least it could have done so by email as it had Morgandinho's email address for approximately two years prior to the auction." The court did not expressly base its finding of a CUTPA violation on these deficiencies of the defendant but, rather, focused on the conduct of the defendant that led to the auction of the plaintiff's plane.

[10] In so doing, the court reasoned: "The court has previously noted that it was a collective group of missteps by the parties that led them to the courthouse. For example, regarding the billing notices and correspondence of the defendants to the plaintiff, including the notice of any liens, Morgandinho lived at three different residences between August, 2019, and February, 2020. Yet there is no evidence that he ever put in a change of address with the United States Postal Service or made an attempt to notify the defendants of his current address to ensure that he received any correspondence from them. There was also no effort to update the address on the FAA registration of the plane.

the court ordered: "The judgments as to [the plaintiff's CUTPA claims] shall enter jointly and severally as to . . . Master Aviation and [the defendant] in the amount of $124,218.19 in damages plus $500 in attorney's fees and $500 in punitive damages for a total judgment of $125,218.19." This appeal followed.

On appeal, the defendant claims that the court erred in concluding that it violated CUTPA by charging the plaintiff storage fees because those fees were authorized under § 49-92g in that it stored the plane at the request of Master Aviation, which was the legal possessor of the plane at that time. We agree.

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: **(1)** [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; **(2)** whether it is immoral, unethical, oppressive, or unscrupulous; **(3)** whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because

Further, there were significant periods of time when Morgandinho was out of contact with Master Aviation, leaving it without direction as to his intentions with respect to the plane. On at least two occasions, he had phone conversations with either Speakmaster or the Silvestros in which he yelled and used profane language about the defendants' demands for payment. That conduct only hardened the positions of the defendants and made a resolution less likely. In short, his attitude and inattention to the matter at hand played a role in the eventual auctioning of the plane. Lastly, the conduct of the trial took only approximately [one and one-half days] with few witnesses."

to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Herron* v. *Daniels*, 208 Conn. App. 75, 94–95, 264 A.3d 184 (2021).[11]

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference." (Internal quotation marks omitted.) Id., 96. Here, however, our review of the court's determination that the defendant violated CUTPA by charging the plaintiff storage fees in the absence of a request from, or the consent of, the plaintiff "requires us to construe the language of [§ 49-92g]. Consequently . . . our review is plenary. . . . [W]hen construing the language of a statute, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If,

[11] We also are mindful that, in evaluating whether the defendant's conduct caused substantial injury to the plaintiff, our Supreme Court has explained that "not . . . every consumer injury is legally unfair . . . . To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." (Internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 802, 219 A.3d 767 (2019). Not only did the plaintiff never attempt to retrieve its plane from the defendant, it also made no attempt to dissolve the defendant's lien on the plane. See General Statutes § 49-92h (b) ("[t]he owner of the aircraft, or anyone having a legal or equitable interest therein, may apply to any judge of the Superior Court, within whose jurisdiction the aircraft is held or where the lienor resides, to dissolve the lien upon the substitution of a bond with sufficient surety"). To that extent, the injury claimed by the plaintiff in this case—the alleged unauthorized sale of its plane—was not an injury that the plaintiff could not reasonably have avoided.

We also agree with the defendant's argument that, to the extent the court's finding of a CUTPA violation was based, in part, on the defendant's collection of $1400 more than the amount of its lien, that sum, relative to the plaintiff's claimed injury—the value of the plane—did not constitute a substantial injury to the plaintiff. See *Web Press Services Corp.* v. *New London Motors, Inc.*, 205 Conn. 479, 484, 533 A.2d 1211 (1987).

after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) Id., 90–91.

Section 49-92g, which establishes the statutory framework for aircraft liens, provides in relevant part: "Any person who stores . . . at the request of or with the consent of the owner, his agent or *legal possessor of an aircraft* . . . has a lien upon the aircraft until the sum due for any fees, expenses or charges for such storage . . . has been paid. . . ." (Emphasis added.) The term "legal possessor" is not defined in § 49-92g or in any other statute. It is well settled that, "[i]n the absence of a definition of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Middlebury* v. *Connecticut Siting Council*, 326 Conn. 40, 49, 161 A.3d 537 (2017).

Black's Law Dictionary defines legal possessor as "[o]ne with the legal right to possess property . . . as contrasted with the legal owner who holds legal title." Black's Law Dictionary (9th Ed. 2009) p. 1283. To possess means "[t]o have in one's actual control . . . ." Id., p. 1281. In light of these definitions, we conclude that the statute is plain and unambiguous with respect to who constitutes a legal possessor. That is, we do not see more than one likely or plausible meaning of the term "legal possessor." Under these definitions, it is clear that the legal possessor is one who is legally in control of an aircraft, versus the owner who holds title to it.

Here, it was not, nor could it reasonably have been, argued that the plaintiff's plane was not in the control of Master Aviation when Morgandinho placed the aircraft in the possession of Master Aviation and it performed

the repairs requested by the plaintiff and later moved the plane to the defendant's property for storage after completing those repairs. Thus, because Master Aviation was the legal possessor of the plaintiff's plane when it requested that the defendant store the plane, the plain language of § 49-92g authorized the defendant to charge the plaintiff for storing the plane and to file a lien on the plane when the storage charges were not paid. Accordingly, the court's determination that the defendant violated CUTPA by charging the plaintiff storage fees for the plane without the request or consent of the plaintiff was unfounded.[12]

The judgment is reversed as to the plaintiff's CUTPA claim against the defendant Tango Yankee, LLC, and the case is remanded with direction to render judgment for the defendant Tango Yankee, LLC, on that claim; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[12] In light of this conclusion, we need not address the defendant's additional argument that the storage charges did not proximately cause the plaintiff's loss of equity in its plane.